IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

Honokaia ʻOhana, T.J. Akioana,  )
Joseph Papalimu, Allen H.N.  )   Civ. No. 09-00395 ACK-LEK
Lindsey, Troy K. Familiar,  )
Allison Mayeda, Dolores Ramos,  )
Yvonne L.K. Deluz, Lehua  )
Hoʻopai, Penny Miranda, Flora  )
Beamer Solomon, Malama Solomon, )
Leimomi Lum, Angela Thomas,  )
Diana Terukina, Ruby Isaacs, and)
Michael Isaacs,  )
 )
       Plaintiffs,  )
 )
   v.  )
 )
KUALANA PARK, in his capacity as)
Chairperson of the Hawaiian  )
Homes Commission and the  )
Director of the Department of  )
Hawaiian Home Lands; PERRY
ARTATES, DONALD S.M. CHANG,
STUART HANCHETT, MALIA KAMAKA,
FRANCIS LUM, ALAPAKI NAHALE-A,
TRISH MORIKAWA, and HENRY
TANCAYO, in their capacities as
members of the Hawaiian Homes
Commission; HAWAIIAN HOMES
COMMISSION; and DEPARTMENT OF
HAWAIIAN HOME LANDS, STATE OF
HAWAIʻI,

       Defendants.

_____

<u>ORDER (1) GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION
FOR JUDGMENT ON THE PLEADINGS AND FOR SUMMARY JUDGMENT, (2)
DENYING PLAINTIFFS' MOTIONS FOR PARTIAL SUMMARY JUDGMENT, AND (3)
REMANDING PLAINTIFFS' STATE LAW CLAIMS</u>

## **PROCEDURAL BACKGROUND**

On July 13, 2009, Honokaia 'Ohana (an unincorporated association of Honokaia, Hawai'i, homestead lessees) and number of Honokaia lessees or individuals related to them (collectively, "Plaintiffs"), filed a complaint in the Circuit Court of the First Circuit in Hawai'i against the Hawaiian Homes Commission ("HHC"), the Department of Hawaiian Home Lands ("DHHL") (collectively, "State Defendants"), Micah Kane,[1] in his capacity as Chairperson of the HHC and Director of the DHHL, and the remaining members of HHC, in their official capacities (collectively, "Defendants").

On August 24, 2009, Defendants removed the case to this Court pursuant to 28 U.S.C. §§ 1441 and 1446.  Doc. No. 1.  On May 5, 2010, Plaintiffs filed a second amended complaint ("SAC"),[2] and on May 27, 2010, Defendants filed an answer.  Doc. Nos. 26, 30.

On July 23, 2010, Plaintiffs filed three separate motions for partial summary judgment.  Respectively, these motions were based on Defendants' alleged (1) breach of trust

---

[1] Micah Kane's successor, Kaulana Park, has been substituted for Kane pursuant to Fed. R. Civ. P. 25(d).

[2] The SAC included several plaintiffs not listed in Plaintiffs' initial complaint filed in the Circuit Court of the First Circuit in Hawai'i.  It also added a claim based on Defendants' alleged violation of Plaintiffs' equal protection rights under the Hawai'i and the United States constitutions.

2

("Pls.' Trust MSJ"), (2) breach of a settlement agreement ("Pls.' Settlement MSJ"), and (3) violation of Plaintiffs' equal protection rights ("Pls.' Equal Protection MSJ").  Doc. Nos. 36, 38, 42, 47.[3/]  Attached to each motion were a concise statement of facts (respectively, "Pls.' Trust CSF," "Pls.' Settlement CSF," and "Pls.' Equal Protection CSF") and a number of exhibits and declarations.  Doc. Nos. 36-44, 46-48, 50.[4/]  Also on July 23, 2010, Defendants filed a motion for judgment on the pleadings and for summary judgment ("Defs.' MSJ").  Doc. No. 45.  This motion was supported by a separate concise statement of facts ("Defs.' CSF") and numerous exhibits and declarations.  Doc. No. 49.

On September 27, 2010, Plaintiffs filed a memorandum in opposition to Defendants' motion for judgment on the pleadings and for summary judgment ("Pls.' Opp'n").  Doc. No. 58.  On the same day, Defendants filed memoranda in opposition to each of Plaintiffs' motions for partial summary judgment (respectively, "Defs.' Trust Opp'n," "Defs.' Settlement Opp'n," and "Defs.'

---

[3/] Plaintiffs filed their Equal Protection MSJ twice.  Doc. Nos. 38, 42.

[4/] Plaintiffs violated the Local Rules by attaching their concise statements of facts, exhibits, and declarations to their motions for partial summary judgment.  See D. Haw. Local Rule 56.1(a) ("A motion for summary judgment shall be accompanied by . . . a separate concise statement . . . ." (emphasis added)); Id. 56.1(h)("Affidavits or declarations setting forth facts . . . shall only be attached to the concise statement.").

Equal Protection Opp'n").  Doc. Nos. 59, 61, 63.  Each opposition memorandum was supported by a counter-concise statement of facts (respectively, "Defs.' Trust Opp'n CSF," "Defs.' Settlement Opp'n CSF," and "Defs.' Equal Protection CSF") and a number of exhibits and declarations.  Doc. Nos. 60, 62, 64.

On October 4, 2010, Plaintiffs filed three reply memoranda in support of their motions for partial summary judgment (respectively, "Pls.' Trust Reply," "Pls.' Settlement Reply," and "Pls.' Equal Protection Reply").  Doc. Nos. 65, 66, 67.  New declarations were attached to each reply memorandum.[5] On the same day, Defendants filed a reply memorandum in support of their motion for judgment on the pleadings and for summary judgment ("Defs.' Reply").  Doc. No. 68.

The Court held a hearing on Plaintiffs' motions for partial summary judgment and Defendants' motion for judgment on the pleadings and for summary judgment on October 18, 2010.

### FACTUAL BACKGROUND[6]

This action stems from the Hawaiian Homes Commission

---

[5] Plaintiffs violated the Local Rules by failing to attach these declarations to their concise statements of facts.  See D. Haw. Local Rule 56.1(h) ("Affidavits or declarations setting forth facts . . . shall only be attached to the concise statement.").

[6] The facts as recited in this Order are for the purpose of disposing of the instant motions and are not to be construed as findings of fact that the parties may rely on in future proceedings in this case.

4

Act of 1920, Public Law No. 67-34, 42 Stat. 108.  The Hawaiian Homes Commission Act ("HHCA") was originally enacted by Congress as a federal statute and subsequently adopted as part of the Hawai'i Constitution, pursuant to the Hawaii Admission Act of 1959, Public Law 86-3, 73 Stat. 4, a compact with the United States entered into when Hawai'i was admitted to the Union.  See Keaukaha-Panaewa Cmty. Ass'n v. Hawaiian Homes Comm'n, 588 F.2d 1216, 1218 (9th Cir. 1979); see also Haw. Const. Art. XII.  The HHCA designated roughly 200,000 acres of land to the HHC, to be leased at nominal rates to native Hawaiian beneficiaries.  Keaukaha-Panaewa, 588 F.2d at 1218.

In 1989, an unincorporated association called the Aged Hawaiians filed a lawsuit in state court against the HHC.  The Aged Hawaiians v. Hawaiian Homes Comm'n, 78 Haw. 192, 197, 891 P.2d 279, 285 (Haw. 1995).  On appeal, the Hawai'i Supreme Court held that "the Aged Hawaiians . . . asserted a viable claim under § 1983 alleging a breach of trust duties by" the HHC under the HHCA.  Id. at 210, 891 P.2d at 297.  The Hawai'i Supreme Court also granted the Aged Hawaiians "summary judgment on their claim that the HHC violated their due process rights when it failed to adequately consider their members' acknowledged desire for land sufficient to engage in commercial ranching."  Id. at 213, 891 P.2d at 300.

In early 2001, DHHL hired PBR Hawaii, a professional

5

planning consultant, to assess and recommend future uses of
Hawaiian home lands on Hawai'i Island.  Pls.' Trust MSJ Ex. B at
1, Ex. C at 1; Defs.' Trust Opp'n Yagodich Decl. #2 at ¶ 3.  In
May 2002, DHHL issued a Hawai'i Island Plan draft Final Report.
Defs.' Trust Opp'n Ex. 46, Ex. 50 at 1-2.  In October 2002,
following public commentary on this report, HHC approved the
designation of 2,336 acres in Honokaia for pastoral homestead
use.  Defs.' Trust Opp'n Ex. 50 at 1, 6.[7]  "In order to reduce
development costs and allow timely and practical homestead
awards," HHC designated pastoral homesteads "[i]n areas of at
least 45 inches of average annual rainfall where catchment can
supply water, or where water is available from existing systems."
Id. at 12-13.  Several reports provided to DHHL indicated that
annual rainfall at Honokaia exceeded 45 inches.[8]  The parties

---

[7] Notably, the Native Hawaiian Legal Corporation ("NHLC"),
attorneys for Plaintiffs and the Aged Hawaiian plaintiffs,
objected to the May 2002 report's recommendation that Honokaia be
used for residential homestead lots.  Defs.' Trust Opp'n Ex. 48-
49.  NHLC wanted Honokaia to be designated for all pastoral use,
referring to Honokaia as "prime ranch land," Defs.' MSJ Ex. 48 at
5, and stating that "agricultural uses cannot depend on
catchement [sic] or rainfall in [Honokaia] as pastoral could."
Defs.' MSJ Ex. 49 at 1.  Ultimately, HHC designated 538 acres in
Honokaia for subsistence agriculture and 93 acres in Honokaia for
general agriculture.  Defs.' Trust Opp'n Ex. 50 at 6.

[8] See Defs.' Trust Opp'n Ex. 46 at 12 (PBR Hawaii's May
2002 report indicating that annual rainfall across the Honokaia
site ranged from 60 to 120 inches); Defs.' Trust Opp'n Ex. 47 at
2.4-1 (Megumi Kon Inc.'s April 2002 report indicating that
annual rainfall was 50 inches in the upper boundary area of Honokaia and
increased at lower elevations); Defs.' Trust Opp'n Ex. 54 at 12
(continued...)

6

dispute whether Defendants were justified in concluding that catchment would be an adequate source of water for ranching at Honokaia.  They also dispute the extent to which successful ranching at Honokaia is now possible given DHHL's failure to provide piped water infrastructure to Plaintiffs' lots.

In February 2005, the <u>Aged Hawaiians</u> parties executed a Settlement Agreement and Release ("Settlement Agreement").  Pls.' Trust MSJ Ex. 3.[9/]  The Settlement Agreement required HHC to "offer and issue leases of undivided interests in pastoral parcels at Honokaia to applicants on the Waimea pastoral waiting list." <u>Id.</u> ¶ 1.  Within two years, HHC was required to "amend the undivided leases to identify a specific parcel in Honokaia of sufficient size to raise one to five animals." <u>Id.</u> ¶ 2.

Defendants claim they selected Honokaia for the Settlement Agreement "because of its good carrying capacity," "it was the best pastoral lands in the North Hawaii inventory," and "average rainfall estimates supported the use of catchment systems for pastoral use." Defs.' Trust Opp'n Yagodich Decl. #2 at ¶ 8; Defs.' Trust Opp'n CSF ¶ 8.  Defendants further contend

_____

[8/](...continued)
(University of Hawaii's 1997 report indicating that annual rainfall at Honokaia was 45 inches and 80 inches at different parts of the site).

[9/] The Settlement Agreement was executed by the <u>Aged Hawaiians</u> plaintiffs on February 3, 2005, is dated February 7, 2005, and was filed in the Circuit Court on February 14, 2005. Pls.' Trust MSJ Ex. 3 at 7-8.

if they "could not rely on catchment systems, the settlement could not have occurred under the extremely short deadlines of the Settlement Agreement because there was no other readily-available water source at Honokaia, and it would take years and millions of dollars for DHHL to develop its own source."  Defs.' Trust Opp'n Yagodich Decl. #2 at ¶ 8; Defs.' Trust Opp'n CSF ¶¶ 9-10.

In January through March 2005, DHHL issued undivided interest pastoral leases at Honokaia to a number of the individual plaintiffs to this lawsuit.  Defs.' CSF ¶ 2.[10/] Several of these leases contained addendums including a provision that:

> [DHHL] shall plan the development by providing architectural and engineering design, drawing and specifications for the site including the roadway system, subdivision of the lots, natural drainage was [sic], off site and on-site infrastructure and all other requirements.  No water system will be provided. However, the lessee may install water catchment facilities.

Defs.' MSJ Exs. 11, 15, 19 (Paragraph 7(b) of the lease addendums).  These addendums further provided that "[DHHL] at its discretion may develop the infrastructure in reasonable phases

_____

[10/] In January 2005, DHHL issued an undivided interest lease to plaintiff Terukina with a commencement date of December 15, 2004.  Defs.' MSJ Ex. 19.  In February 2005, DHHL issued undivided interest leases with commencement dates of February 1, 2005, to plaintiffs DeLuz, Lindsey, and Ramos.  Id. at Exs. 7, 13, 17.  In March 2005, DHHL issued undivided interest leases with commencement dates of February 1, 2005, to plaintiffs Lum and Papalimu.  Id. at Exs. 11, 15.

and make changes in the infrastructure portion of the project as may be found necessary or desirable." Defs.' MSJ Exs. 11, 15, 19 (Paragraph 7(c) of the lease addendums).

In early July 2005, DHHL notified these and other eligible lessees of the opportunity to obtain additional acreage. Defs.' CSF ¶ 3; Defs.' MSJ Ex. 20 at 5-6. On July 14, 2005, DHHL representatives and consultants[11] held a community meeting to discuss with lessees the Settlement Agreement, the Honokaia project, and the ranch plan process. Defs.' CSF ¶ 7. DHHL stated at this meeting "that a water system was not part of the project" and that lessees would have to utilize catchment, to which prospective additional acreage applicants objected. Defs.' CSF ¶ 7; Defs.' MSJ Ex. 1.

By the July 29, 2005 deadline, seventy eligible lessees formally confirmed their interest in applying for additional acreage. Defs.' CSF ¶ 3; Defs.' MSJ Ex. 20 at 6. In August and September 2005, DHHL facilitated workshops on ranching and preparing ranch plans and offered personalized ranch plan assistance to these potential applicants. Defs.' CSF ¶ 11;

---

[11] DHHL retained Oceanit, Inc., to help facilitate and document community meetings; maintain the Honokaia project website; prepare a development plan; secure environmental clearances; design the subdivision improvements; and secure final county subdivision approvals. Defs.' CSF ¶ 7. To provide technical assistance to ranchers for the ranch plan process, DHHL contracted with the Cooperative Extension Service at the University of Hawai'i. Id. ¶ 11.

Defs.' MSJ Ex. 20 at 6-7.  By the October 7, 2005 deadline, forty-two ranch plans were submitted for evaluation.  Defs.' CSF ¶ 12; Defs.' MSJ Ex. 20 at 7.

DHHL held a second community meeting on October 17, 2005.  Among the items discussed were a land analysis for Honokaia, that DHHL was not responsible for providing water, and possible community facilities.  Defs.' CSF ¶ 8.  On November 15, 2005, HHC approved awarding additional acres to eleven lessees, each of whose ranch plans were deemed satisfactory by an independent panel of experts.  Defs.' CSF ¶¶ 13-14; Defs.' MSJ Ex. 20 at 7-8.  These ranch plans represented that the lessees were capable of carrying out their planned ranching activities by using catchment or similar systems.  Defs.' MSJ at 15; see id. at Exs. 27-35.  DHHL held a third community meeting on December 12, 2005, to discuss the results of the ranch plan process as well as the design and construction process and lot selection.  Defs.' CSF ¶ 9.

DHHL continued with the planning, subdivision, and construction of the Honokaia project.  Defs.' CSF ¶ 17.  In mid-December 2005, Defendants were notified about the County of Hawaii's (the "County") Ahualoa Well and Reservoir project.  Pls.' Trust MSJ Ex. 9.  The Ahualoa well site was adjacent to the Honokaia pastoral homestead area and intended to provide potable

water for nearby areas.  Id.; Pls.' Trust CSF ¶¶ 13-14.[12/]
According to DHHL civil engineer William H. Makanui, III, while
the Honokaia project was underway Defendants briefly assessed the
potential to install a water line from the Ahualoa well to
Honokaia.  Defs.' Trust Opp'n Makanui Decl. at ¶ 10.  However,
due to cost and the need to stay on pace to meet the Settlement
Agreement's construction deadlines, DHHL did not pursue this
further.  Id.

     A $3.2 million budget for the construction of Phase I
of the Honokaia project was submitted to and approved by HHC on
February 28, 2006.  Defs.' CSF ¶ 18; Defs.' MSJ Ex. 21.  In May
2006, DHHL notified the Planning Department for the County that
it was exercising its power to dictate the land use and zoning
for its lands to designate the applicable zoning for the Honokaia
project.  Defs.' CSF ¶ 20.  About the same time, DHHL sought a
variance from the County allowing a subdivision of primary
homestead lots to be created in Honokaia without a water system
meeting the minimum requirements of the Department of Water
Supply ("DWS").  Pls.' Equal Protection MSJ Ex. 3.  The County
approved the variance application on October 13, 2006.  Pls.'

-------------------------------------------------------------

[12/] Defendants did not provide the County any comments on the
proposed Ahualoa project during the 30-day public commentary
period.  Pls.' Trust MSJ Ex. 9.

Equal Protection MSJ Ex. 5.[13]

In January and February 2007, the 2005 undivided interest leases were amended, effective as of February 2007. Defs.' CSF ¶ 15. These lease amendments stated that the primary homestead lots were approved "without a water system meeting the minimum requirements of" DWS, "there is currently no dedicable public water system serving the [lot leased]," and the County "will not be and is not responsible for providing public water to the lot." Defs.' MSJ Exs. 7, 12, 15, 17. In February and September 2007, DHHL issued eleven additional acreage leases with commencement dates of February 5, 2007. Defs.' CSF ¶ 15; Pls.' Trust CSF ¶ 18.[14]

On January 29, 2007, twelve additional acreage lessees formed Honokaia ʻOhana to advocate for the construction and installation of infrastructure to pipe water to their respective pastoral homestead lots at Honokaia. Pls.' Trust MSJ Isaacs Decl. at ¶¶ 37-38; Pls.' Trust MSJ Ex. 14. Shortly thereafter,

_____

[13] On April 5, 2007, the County approved a second subdivision, which included the additional acreage lots awarded pursuant to the Settlement Agreement, as a "Farm Subdivision." Defs.' Equal Protection Opp'n Ex. 45. The County does not require that a water system be provided as a condition for approval of a Farm Subdivision. Id.; Defs.' Equal Protection Opp'n Makanui Decl. at ¶ 6.

[14] On February 9, 2007, DHHL issued an additional acreage lease to plaintiff R. Isaacs. Defs.' MSJ Ex. 10. On September 21, 2007, DHHL issued additional acreage leases to plaintiffs Deluz, Hoʻopai, Miranda, Ramos and F. Solomon. Id. at Exs. 8, 9, 14, 16, 18.

Honokaia ʻOhana submitted a proposal to HHC for a $159,755 grant to develop and install a water delivery system for its members. Defs.' Trust Opp'n Yagodich Decl. #2 at ¶ 14; Pls.' Trust MSJ Ex. J.  HHC voted to deny the request on March 20, 2007, although Honokaia ʻOhana presented their grant proposal to HHC in May and September 2007.[15/]  Defs.' Trust Opp'n Yagodich Decl. #2 at ¶¶ 14-16; Defs.' Trust Opp'n Ex. 51.  During this time DHHL looked into whether there were other water sources for Honokaia.  Defs.' CSF ¶ 11.  According to Defendants, "[n]o cost-effective solution could be developed for piped water at Honokaia that was fair to all lessees."  Id. ¶ 11.

In December 2007, as part of a separate project in Kealakehe, Hawaiʻi, DHHL notified the County that, pursuant to a 2002 Memorandum of Understanding ("MOA") between DHHL and the County, DHHL was exercising its power to designate zoning for its lands.  Defs.' Equal Protection Opp'n CSF ¶ 5; Id. at Exs. 67-68. This project involved a commercial development agreement and lease with a private company to develop certain DHHL lands for commercial and other uses intended to generate revenue for DHHL's homestead programs.  Defs.' Trust Opp'n Yagodich Decl. #2 at ¶ 17.

Between June 2007 and February 2009, Plaintiffs'

_____

[15/] It is unclear when Plaintiffs were notified that HHC had rejected their grant proposal.

counsel and then-DHHL Director Kane exchanged several letters regarding the Honokaia homesteads and DHHL's compliance with the Settlement Agreement and its discharge of its trust duties under the HHCA.  Pls.' Trust MSJ Exs. 15-19.  Plaintiffs filed their initial complaint in this lawsuit on July 13, 2009, in the Circuit Court of the First Circuit in Hawai'i.  Defs.' MSJ Ex. 36.

### LEGAL STANDARD[16/]

The purpose of summary judgment is to identify and dispose of factually unsupported claims and defenses.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Summary judgment is therefore appropriate if the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "A fact is 'material' when, under the governing substantive law, it could affect the outcome of the case.  A 'genuine issue' of material fact arises if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  Thrifty Oil Co. v. Bank of Am. Nat'l Trust &

---

[16/] Because the Court looked beyond the pleadings in resolving the issues at bar, the Court's order addresses Defendants' summary judgment motion, and not their motion for judgment on the pleadings.  See Fed. R. Civ. P. 12(c); Hal Roach Studios v. Richard Feiner and Co., 896 F.2d 1542, 1550 (9th Cir. 1990).

Sav. Ass'n, 322 F.3d 1039, 1046 (9th Cir. 2003) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)) (citation omitted).[17]  Conversely, where the evidence could not lead a rational trier of fact to find for the nonmoving party, no genuine issue exists for trial.  <u>See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).  "Only admissible evidence may be considered in deciding a motion for summary judgment."  <u>Miller v. Glenn Miller Prods., Inc.</u>, 454 F.3d 975, 988 (9th Cir. 2006).

The moving party has the burden of persuading the court as to the absence of a genuine issue of material fact.  <u>Celotex</u>, 477 U.S. at 323; <u>Miller</u>, 454 F.3d at 987.  The moving party may do so with affirmative evidence or by "'showing'—that is pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."  <u>Celotex</u>, 477 U.S. at 325.[18]  Once the moving party satisfies its burden, the nonmoving party cannot simply rest on the pleadings or argue that any

---

[17] Disputes as to immaterial issues of fact do "not preclude summary judgment."  <u>Lynn v. Sheet Metal Workers' Int'l Ass'n</u>, 804 F.2d 1472, 1483 (9th Cir. 1986).

[18] When the moving party bears the burden of proof at trial, that party must satisfy its burden with respect to the motion for summary judgment by coming forward with affirmative evidence that would entitle it to a directed verdict if the evidence were to go uncontroverted at trial.  <u>Miller</u>, 454 F.3d at 987.  When the nonmoving party bears the burden of proof at trial, the party moving for summary judgment may satisfy its burden with respect to the motion for summary judgment by pointing out to the court an absence of evidence from the nonmoving party.  <u>Id.</u>

disagreement or "metaphysical doubt" about a material issue of fact precludes summary judgment.  See id. at 323; Matsushita Elec., 475 U.S. at 586; California Arch. Bldg. Prods., Inc. v. Franciscan Ceramics, Inc., 818 F.2d 1466, 1468 (9th Cir. 1987).[19/] The nonmoving party must instead set forth "significant probative evidence" in support of its position.  T.W. Elec. Serv. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987). Summary judgment will thus be granted against a party who fails to demonstrate facts sufficient to establish an element essential to his case when that party will ultimately bear the burden of proof at trial.  See Celotex, 477 U.S. at 322.

When evaluating a motion for summary judgment, the court must construe all evidence and reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. See T.W. Elec. Serv., 809 F.2d at 630-31.[20/]  Accordingly, if "reasonable minds could differ as to the import of the evidence," summary judgment will be denied.  Anderson, 477 U.S. at 250-51.

_____

[19/] Nor will uncorroborated allegations and "self-serving testimony" create a genuine issue of material fact.  Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th Cir. 2002); see also T.W. Elec. Serv. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

[20/] At the summary judgment stage, the court may not make credibility assessments or weigh conflicting evidence.  Anderson, 477 U.S. at 249; Bator v. Hawaii, 39 F.3d 1021, 1026 (9th Cir. 1994).

**DISCUSSION**

Plaintiffs assert eight claims: (1) DHHL's failure to "provid[e] adequate infrastructure and water in Honokaia[] ha[s] effectively violated § 219.1, and other sections of the HHCA," SAC ¶ 61; (2) Defendants "ignored HHCA § 101 by refusing to take reasonable steps to provide [Plaintiffs] adequate amounts of water and supporting infrastructure to allow homestead lands to be usable and accessible," SAC ¶ 65; (3) Defendants breached various common law trust or fiduciary duties, SAC at 17-21; (4) Defendants breached their trust or fiduciary duties under HRS Chapter 673, SAC at 21-23; (5) Defendants' failure "to assist Plaintiffs by providing the financing for installing adequate infrastructure and water in Honokaia" has violated Article XII, §§ 1-2 of the Hawaiʻi Constitution, SAC ¶ 110; (6) Defendants violated the Settlement Agreement by "refusing to act as required under Paragraph 9, and refusing, in bad faith, under Paragraph 24, to mediate or negotiate the interpretation and implementation of Paragraph 9," SAC ¶ 114; (7) Defendants violated Plaintiffs' equal protection rights under the Hawaiʻi and the United States constitutions by treating the Honokaia project differently than the Kealakehe project, SAC ¶¶ 120-123; and (8) Defendants violated 42 U.S.C. § 1983 by "den[ying] and refus[ing] to provide Plaintiffs[] adequate infrastructure and water to their respective Hawaiian Homestead pastoral lots, and otherwise

17

violat[ing] other terms of the HHCA and their trust

responsibilities," SAC ¶ 130.

Defendants move for judgment on the pleadings and for

summary judgment as to each of Plaintiffs' claims. Plaintiffs

move for partial summary judgment with respect to their breach of

trust, breach of the Settlement Agreement, and equal protection

claims.[21/]

For the reasons discussed below, the Court grants in

part and denies in part Defendants' motion and denies Plaintiffs'

motions. The Court dismisses Plaintiffs' two federal claims:

Claim Seven, to the extent it asserts a violation of the Equal

Protection Clause of the Fourteenth Amendment, and Claim Eight,

which asserts a violation of 42 U.S.C. § 1983. Because only

state law claims remain, and because those claims raise

important, difficult, and novel issues of Hawai'i law, the Court

declines to exercise supplemental jurisdiction over those claims

and remands the case to state court.

I.       **Standing**

At the outset, Defendants contend the individual

plaintiffs who are not lessees at Honokaia lack standing and that

Honokaia 'Ohana lacks associational standing. Defs.' MSJ at 10-

---

[21/] Plaintiffs' motions for partial summary judgment and
their replies in support of these motions (as well as their
opposition to Defendants' motion for judgment on the pleadings
and for summary judgment) often blanketly assert arguments
without tying them to particular claims.

12; Defs.' Reply at 2-4.  Because there are plaintiffs whose standing is not disputed, and the Court dismisses the federal claims and declines to exercise supplemental jurisdiction over the remaining state law claims, it is unnecessary for the Court to determine whether plaintiffs who are designated successors and/or relatives of Honokaia lessees lack standing.[22/]  Further, the Court is unpersuaded by Defendants' argument that Honokaia 'Ohana lacks associational standing.  First, it is clear that at least one of Honokaia 'Ohana's members is a lessee at Honokaia. Pls.' Trust MSJ Ex. 14; Defs.' MSJ Exs. 6-19; see The Aged Hawaiians v. Hawaiian Homes Comm'n, 78 Haw. 192, 205, 891 P.2d 279, 292 (Haw. 1995).  Second, to the extent that Honokaia 'Ohana seeks prospective relief, "'it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured.'"  Aged Hawaiians, 78 Haw. at 205, 891 P.2d at 292 (quoting Hunt v. Wash. Apple Adver. Comm'n, 432 U.S. 333, 343 (1977)); see also Pele Def. Fund v. Paty, 73 Haw. 578, 591-595, 837 P.2d 1247, 1257-59 (Haw. 1992).

---

[22/] Plaintiffs M. Solomon, Thomas, and M. Isaacs have authority to act for, and are designated successors to Honokaia homestead leases held by their mothers, F. Solomon, Lum, and R. Isaacs, respectively.  SAC ¶ 12.  Plaintiff Akiona, the grandson of homestead lessee James Akiona, Sr., assists with the day-to-day ranching activities on his grandfather's homestead.  Id. ¶ 13.

## II.   Federal Claims

### A.   Claim Seven - Fourteenth Amendment Equal Protection

Claim Seven of the SAC alleges that Plaintiffs' equal protection rights under the Fourteenth Amendment of the United States Constitution were violated because Defendants treated the Honokaia project differently than the Kealakehe project.  SAC ¶¶ 120-23.[23/]

As Defendants argue, there is no direct cause of action under the United States Constitution against state defendants where such defendants are amenable to suit under 42 U.S.C. § 1983.  Defs.' MSJ at 36-37; see Ward v. Caulk, 650 F.2d 1144, 1147 (9th Cir. 1981); see also Arpin v. Santa Clara Valley Transp. Agency, 261 F.3d 912, 925 (9th Cir. 2001) ("[A] litigant complaining of a violation of a constitutional right does not have a direct cause of action under the United States Constitution but must utilize 42 U.S.C. § 1983."); Gauvin v. Trombatore, 682 F. Supp. 1067, 1071 (N.D. Cal. 1988) (dismissing Fourteenth Amendment claims against state agencies and officials). Because Plaintiffs could have, but failed to raise their Fourteenth Amendment equal protection claim under § 1983, this claim fails as a matter of law.

---

[23/] Claim Seven also asserts a violation of Plaintiffs' equal protection rights under the Hawai'i Constitution.  This aspect of Claim Seven will be addressed below, infra Section II.

Furthermore, the Court finds that it would be futile for Plaintiffs to amend the SAC to assert a Fourteenth Amendment equal protection claim pursuant to § 1983.  See Steckman v. Hart Brewing, Inc., 143 F.3d 1293, 1298 (9th Cir. 1998) (noting that dismissal with prejudice is proper where "any amendment would be an exercise in futility").  Such a claim would fail for a number of reasons.[24]

To begin with, Plaintiffs' claim would likely be barred by the governing two-year statute of limitations.  See Allen v. Iranon, 99 F. Supp. 2d 1216, 1238 (D. Haw. 1999) ("In Hawaii, the statute of limitations for actions under Section 1983 is two years from the date of the violation.").  As Defendants argue, Plaintiffs' claim likely accrued as of December 2007, when DHHL declared the zoning for the Kealakehe project and allegedly treated this project differently than the Honokaia project. Defs.' MSJ at 39; Defs.' Equal Protection Opp'n at 8-9; Defs.' MSJ Ex. 24.  Plaintiffs admit that DHHL's December 2007 zoning designation letter was "surely a public document," Pls.' Equal

---

[24] The Court notes that Plaintiffs' § 1983-based equal protection claim could only seek prospective relief against the state officials acting in their official capacities.  See Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 & n.10 (1989). As discussed more fully below, HHC and DHHL and its officials acting in their official capacities are not proper defendants under § 1983; only state officials acting in their official capacities, when sued for prospective declaratory and injunctive relief, are amenable to suit under § 1983.  See infra Section I.B.1.

Protection Reply at 19, so by December 2007, Plaintiffs "should have discovered the [equal protection violation], the injury to [Plaintiffs], and the connection between the [violation] and the injury." See Pele Def. Fund v. Paty, 73 Haw. 578, 599 & n.15, 837 P.2d 1247, 1260 & n.15 (Haw. 1992).  As a result, the two-year statute of limitations would have run by May 6, 2010, when Plaintiffs first asserted their equal protection claim in the SAC.  Defs.' MSJ at 39.

Alternatively, if Plaintiffs' claim were not time-barred, it would fail on the merits.  Plaintiffs assert a "class of one" equal protection claim based on Village of Willowbrook v. Olech, 528 U.S. 562 (2000).  To establish their claim, Plaintiffs must show "that [they] ha[ve] been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." Id. at 1074. Intentional discrimination means "'the decision maker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group.'" Neaves v. San Diego, 70 F. App'x 428, 430 (9th Cir. 2003) (unpublished disposition) (quoting Personnel Adm'r of Mass. v. Feeney, 442 U.S. 256, 279 (1979)).[25/]

Plaintiffs' claim is based on Defendants' actions with

---

[25/] In accordance with U.S. Ct. of App. 9th Cir. Rule 36-3, the Court is not relying on this unpublished disposition, although it finds it instructive.

regard to the Honokaia and Kealakehe projects.  In May 2006, then-HHC Chairperson Kane informed County Planning Director Christopher Yuen (1) how DHHL had chosen to zone the two Honokaia subdivisions and (2) that DHHL would design the project in conformity with County standards and any applicable variances. Defs.' MSJ Ex. 22.  As this letter also indicated, DHHL's engineer sought a variance from the County allowing a subdivision of Honokaia primary homestead lots to be created without a water system meeting DWS minimum requirements.  Pls.' Equal Protection MSJ Ex. 3.  DHHL's engineer stated that "[c]onstructing a water supply system to County standards would create a financial hardship for DHHL and the potential lessees."  Id.  The County approved DHHL's variance application.  Id. at Ex. 5.  Although the May 2006 letter did not mention the MOA, DHHL's course of action was in conformity with the MOA.  See Defs.' MSJ Ex. 22; Pls.' Equal Protection MSJ Ex. 2.

In December 2007, HHC Chairperson Kane informed Director Yuen that, pursuant to the MOA, DHHL had decided to zone the Kealakehe property as a "Project District."  Defs.' MSJ Ex. 24.  DHHL's project at Kealakehe, which was intended to generate revenue for DHHL's homestead programs, involved a commercial development and lease agreement with a private developer.  Pls.' Equal Protection MSJ Ex. 4; Defs.' Trust Opp'n Yagodich Decl. #2 at ¶ 17.  In February 2008, Director Yuen acknowledged DHHL's

23

zoning designation and noted that under the MOA, DHHL would be required to follow the County's normal land use controls for that designation.  Id.  The Kealakehe project was subsequently canceled.  Defs.' MSJ Yagodich Decl. at ¶ 17.

Defendants persuasively argue that Plaintiffs' equal protection claim, were it to be asserted under § 1983, would fail as a matter of law.  Defs.' MSJ at 37-39; Defs.' Equal Protection Opp'n at 10-14. The Court finds that the Honokaia and Kealakehe projects were treated the same and that the projects were not similarly situated.  And in any event, there was a rational basis to treat the projects differently.  Moreover, the Kealakehe project was canceled.

First, Plaintiffs fail to demonstrate that Defendants' treatment of the Kealakehe project differed from their treatment of the Honokaia project.  "[F]or both projects, DHHL designated the zoning for its lands, with the understanding that the normal land use controls would apply based on the designated zoning." Defs.' Equal Protection Opp'n at 11.  In both instances, DHHL bypassed the usual process for land use designations, as contemplated by the MOA.  Plaintiffs offer no evidence that DHHL failed thereafter to comply with the land use regulations that applied as a result of how the projects were zoned.

Granted, DHHL designated different zoning districts for the two projects.  But Plaintiffs' equal protection claim does

24

not appear to be premised on DHHL's particular zoning choices.
To the extent that it is, such an argument fails for the reasons
discussed below.  Instead, Plaintiffs attempt to support their
claim by suggesting Defendants should not have followed the MOA
with regard to either project.  Pls.' Equal Protection MSJ at 7-
14.  According to Plaintiffs, Defendants (1) unnecessarily
followed the MOA with regard to Honokaia, because their inherent
powers allow them to circumvent County regulations and (2) were
unauthorized in following the MOA for Kealakehe, because this
property was not used for homesteading.  As Defendants point out,
however, these arguments do not support Plaintiffs' equal
protection claim.  Defs.' Equal Protection Opp'n at 13.
Similarly inapposite is Plaintiffs' contention that Defendants
should not have sought a variance in light of their access to
funding and their various trust duties.  Pls.' Equal Protection
MSJ at 9-13.

        Second, Plaintiffs fail to demonstrate that the
Honokaia lessees and the Kealakehe developer were similarly
situated.  That the Honokaia and Kealakehe subdivisions were both
DHHL projects does not make them similarly situated.  Pls.' Equal
Protection Reply at 10.  To the contrary, "Plaintiffs are lessees
of pasture lots developed by DHHL for pasture and related
homesteading purposes" while "the lessee at Kealakehe is a
private developer selected to develop commercial land in order to

25

generate revenue for DHHL's homesteading programs."  Defs.' Equal Protection Opp'n at 12.  As Defendants further point out, Plaintiffs' assertion that they were similarly situated to the Kealakehe developer is belied by Plaintiffs' argument that DHHL had greater authority with respect to the Honokaia project than with respect to the Kealakehe project.  See id. at 13; Pls.' Equal Protection MSJ at 7-8.

Finally, the Court notes that even if Plaintiffs could show they were treated differently than the Kealakehe lessee, and that the two parties were similarly situated, Plaintiffs' "class of one" claim would fail because they offer no evidence that Defendants "selected or reaffirmed . . . [their] course of action at least in part because of, not merely in spite of, its adverse effects upon [Plaintiffs]".  Neaves, 70 F. App'x at 430 (citation omitted).  Additionally, Plaintiffs' claim would fail because Plaintiffs do not demonstrate there is no "reasonably conceivable state of facts that could provide a rational basis for the [Defendants'] classification."  SeaRiver Mar. Fin. Holdings, Inc. v. Mineta, 309 F.3d 662, 679 (9th Cir. 2002); see also Cramer v. City and County of Honolulu, No. CIV 09-00223 SOM/KSC, 2010 WL 2541804, at *4 (D. Haw. June 23, 2010) ("Under equal protection analysis, a classification neither involving fundamental rights nor proceeding along suspect lines is accorded a strong presumption of validity." (internal quotation marks omitted)).

26

Because it would be an exercise in futility for Plaintiffs to amend the SAC to assert their Fourteenth Amendment equal protection claim under § 1983, the Court dismisses Claim Seven – to the extent it relies on the United States Constitution – with prejudice.  See Steckman, 143 F.3d at 1298.

## B.  Claim Eight - 42 U.S.C. § 1983

Claim Eight of the SAC alleges that Defendants violated 42 U.S.C. § 1983[26] by "den[ying] and refus[ing] to provide Plaintiffs[] adequate infrastructure and water to their respective Hawaiian Homestead pastoral lots, and otherwise violat[ing] other terms of the HHCA and their trust responsibilities."  SAC ¶ 130.  Plaintiffs request "a judgment for appropriate declaratory relief, as well as costs and reasonable attorney's fees under 42 U.S.C. § 1988."  Id. ¶ 131.

### 1.  Sovereign Immunity

Defendants correctly note that "neither a State nor its officials acting in their official capacities are 'persons' under

---

[26] 42 U.S.C. § 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

§ 1983." <u>Will v. Michigan Dep't of State Police</u>, 491 U.S. 58, 71 (1989); <u>see</u> Defs.' MSJ at 40. Plaintiffs are suing the State of Hawai'i HHC and DHHL, among other defendants. While Plaintiffs do not expressly name the State of Hawai'i as a defendant, HHC and DHHL are state agencies that are regarded as state entities. <u>See</u> <u>Pennhurst State School & Hosp. v. Halderman</u>, 465 U.S. 89, 100 (1984) ("[I]n the absence of consent a suit in which the State <u>or one of its agencies or departments</u> is named as the defendant is proscribed . . . .") (emphasis added). Consequently, HHC and DHHL and its officials acting in their official capacities are not proper defendants under § 1983. <u>See Will</u>, 491 U.S. at 71; <u>Wolfe v. Strankman</u>, 392 F.3d 358, 364 (9th Cir. 2004).

Moreover, "[e]ven though [Defendants] may have 'waived [their] Eleventh Amendment immunity when [they] removed this case to federal court . . . such waiver does not make a state or its agencies 'persons' under § 1983.'" <u>Lutz v. Delano Union Sch. Dist.</u>, No. 1:08 CV 01787 OWW DLB, 2009 WL 2525760, at *7 n.3 (E.D. Cal. Aug. 7, 2009) (citation omitted); <u>see also Itagaki v. Frank</u>, Civil No. 09-00110 SOM/LEK, 2010 WL 2640110, at *3-5 (D. Haw. June 29, 2010).[27/]

---

[27/] As the parties acknowledged for the first time at oral argument, in response to questioning by the Court, Defendants waived their claims to sovereign immunity by removing this case to federal court. <u>See Lapides v. Bd. of Regents of the Univ. Sys. of Ga.</u>, 535 U.S. 613 (2002); <u>Embury v. King</u>, 361 F.3d 562, 566 (9th Cir. 2004) (citing <u>Lapides</u> for proposition that in (continued...)

Nonetheless, state officials acting in their official capacities, when sued for prospective declaratory and injunctive relief, <u>are</u> "persons" under § 1983 because "official-capacity actions for prospective relief are not treated as actions against the State." <u>Will</u>, 492 U.S. at 71 n. 10; <u>see also Wolfe</u>, 392 F.3d at 364-365 (permitting § 1983 claims for prospective injunctive and declaratory relief against state officials acting in their official capacities).

The parties dispute whether Plaintiffs' § 1983 claim seeks prospective relief.  Plaintiffs claim they "seek declaratory and injunctive relief under 42 U.S.C. § 1983 and, separately, damages relief under the state's explicit waiver of sovereign immunity under HRS chapter 673."  Pls.' Trust Reply at 10-11; <u>see</u> SAC ¶¶ 198-99, 130.  Defendants claim "[a]n order requiring Defendants to expend State funds to pay for a piped water system due to the alleged breach of duties by Defendants

---

<sup>27/</sup>(...continued)
removing a case to federal court, a state defendant waives its Eleventh Amendment immunity).  Defendants seem mistaken about the scope of this waiver.  Although some circuit courts have read <u>Lapides</u>'s waiver rule narrowly, holding that "a state defendant removing a case to federal court takes with it whatever sovereign immunity it had in state court," the Ninth Circuit has held the "<u>Embury</u> holding strongly suggests a broader interpretation of <u>Lapides</u>."  <u>Indep. Living Ctr. of S. Cal., Inc. v. Maxwell-Jolly</u>, 572 F.3d 644, 662 n.20 (9th Cir. 2009).  In other words, Defendants' removal appears to have waived their sovereign immunity defense with regard to each of Plaintiffs' claims, including those claims that would have been barred by sovereign immunity in state court.  <u>See Ingrassia v. Chicken Ranch Bingo and Casino</u>, 676 F. Supp. 2d 953, 960-61 (E.D. Cal. 2009).

29

would likewise be a prohibited form of money damages." Defs.'
Reply at 9. Although Plaintiffs explicitly request damages only
with regard to their HRS Ch. 673 claim, and not their § 1983
claim, the Court must "look to the substance rather than to the
form of the relief sought" in order to determine whether
Plaintiffs' official-capacity § 1983 claim properly seeks
prospective relief. See Papasan v. Allain, 478 U.S. 265, 279
(1986). Official capacity § 1983 claims are impermissible if
they seek "[r]elief that in essence serves to compensate a party
injured in the past by an action of a state official in his
official capacity that was illegal under federal law." Id. at
278; see also Pele Def. Fund v. Paty, 73 Haw. 578, 609-10, 837
P.2d 1247, 1266 (Haw. 1992).

Whether Plaintiffs' request for declaratory relief is
"in effect, a request for compensation for the past actions of
[Defendants]," and thus an inappropriate basis for their § 1983
claim, is a close call. Pele Def. Fund v. Paty, 73 Haw. at 611,
837 P.2d at 1267. However, the Court does not need to decide
this issue. Assuming Plaintiffs' § 1983 claim against the state
officials in their official capacities appropriately seeks
prospective relief, the Court concludes that this claim, which is
based on the officials' alleged failure to provide adequate
infrastructure and water to Plaintiffs' homestead lots, is barred
by the applicable statute of limitations.

### 2.   Statute of Limitations

The parties agree that Plaintiffs' § 1983 claim is subject to a two-year statute of limitations.  Pele Def., 73 Haw. at 594-99, 837 P.2d at 1259-61; Allen v. Iranon, 99 F. Supp. 2d 1216, 1238 (D. Haw. 1999).  Consequently, the Court must decide when Plaintiffs' claim first accrued.  The Hawai'i Supreme Court has held that a § 1983 claim based on an alleged breach of trust accrues "when [a plaintiff] discovered or should have discovered the breach of trust, the injury . . ., and the connection between the breach and the injury."  Pele Def., 73 Haw. at 599, 837 P.2d at 1260.

Applying the Pele Defense test to the case at bar,[28/] the Court concludes Plaintiffs' breach of trust claim accrued as of November 2005, when Defendants approved additional acreage awards based on Plaintiffs' ranch plans, which represented that Plaintiffs were capable of carrying out their planned ranching activities utilizing catchment or similar systems.  Defs.' MSJ at 15; see id. at Exs. 27-35.  By this time, Plaintiffs had been told by DHHL in July 2005 "that a water system was not a part of the [Honokaia] project" and again in October 2005 "that DHHL was

---

[28/] Although "federal law controls the question of when a [§ 1983] claim accrues," the Pele Defense test is consistent with federal law, which provides that "[a] claim accrues when the plaintiff knows, or should know, of the injury which is the basis of the cause of action."  Johnson v. California, 207 F.3d 650, 653 (9th Cir. 2000).

not responsible to provide water." Defs.' MSJ Exs. 1-2.

Moreover, several individual plaintiffs had already signed

undivided interest pastoral leases stating "[n]o water system

will be provided" by DHHL and indicating that "lessee may install

water catchment facilities." Id. at Exs. 11, 15, 19.[29/]

Accordingly, Plaintiffs knew or should have known at this time

that Defendants did not consider themselves responsible for

providing infrastructure and water to the Honokaia lessees. This

position by Defendants is ultimately the source of Plaintiffs'

§ 1983 breach of trust claim, which Plaintiffs could have

asserted upon learning about Defendants' position.

The Court is unconvinced by Plaintiffs' contention that

they could not "begin to suffer injury due to Defendants inaction

until after they began to take physical possession of their

pastoral lots and experienced the effects of their

circumstances." Pls.' Equal Protection Reply at 14. Plaintiffs'

---

[29/] The Court notes that Plaintiffs' § 1983 claim would be
time-barred even if this claim were to have accrued in February
2007, once a number of individual plaintiffs had signed leases
acknowledging that their primary homestead lots were approved
"without a water system meeting the minimum requirements of" DWS,
"there is currently no dedicable public water system serving the
[lot leased]," and the County "will not be and is not responsible
for providing public water to the lot." Defs.' MSJ Exs. 7, 12,
15, 17. Indeed, Honokaia 'Ohana was formed in January 2007 "to
collectively advocate for the construction and installation of
infrastructure to pipe water to [members'] respective pastoral
homestead lots at Honokaia so [they] could overcome the shortage
of water that might be supplied by rainfall with limited
catchment facilities and support our ranching activity." Pls.'
Trust MSJ Isaacs Decl. at ¶¶ 37-38.

assertion is undermined by the declaration of Michael Isaacs, one of the founders of the Honokaia ʻOhana and a plaintiff to this lawsuit.  Pls.' Trust MSJ Ex. 19.  It is also undermined by Plaintiffs' objections at the July 2005 community meeting when they were told "that a water system was not part of the project." Defs.' MSJ Ex. 1.[30/]  Isaacs' statements as well as Plaintiffs' objections demonstrate that as of 2005, Plaintiffs "knew of the material facts of the instant breach of trust claims," even if they did not yet "appreciate[] all the legal consequences flowing from the State's alleged nonfeasance or the extent of their monetary damages."  Office of Hawaiian Affairs, 110 Haw. at 364, 133 P.3d at 793; see also id. at 362, 133 P.3d at 791 (discussing how breach of trust claims accrue once plaintiffs learn of "some damage to the trust," and not "when they learn[] of the full extent of their damages").

In particular, Isaacs' declaration includes the

_____

[30/] The July 2005 meeting minutes prepared by Oceanit provide, in pertinent part:

> [Community residents] w[ere] very interested in how they were going to get water to their cattle.  They inquired if a water system was part of the infrastructure. [DHHL Planning Program Manager Darrell Yagodich] responded that a water system was not part of the project. [Residents] still objected and said that their experiences in Puukapu lead them to believe that water will be necessary to raise their cattle.  Some residents expressed that their lots are extremely arid which reduces the productivity of the land.

Defs.' MSJ Ex. 1.

following statements:

> From the first occasion I heard about the lease
> offering for Honokaia homesteads in 2005, I realized
> that without a consistent and adequate supply of water,
> one could not successfully ranch at Honokaia or
> anywhere else.  Pls.' Trust MSJ Isaacs Decl. at ¶ 12.

> Furthermore, building rain catchment facilities is
> prohibitively costly for any individual rancher at
> Honokaia, given the size of storage needed to support
> the number of cattle which might otherwise be
> sustainably raised on the size of homestead lots
> awarded at a ranching area like Honokaia.  Id. ¶ 17.

> My examination of the homestead lease terms to which I
> was asked to agree revealed that the DHHL wanted to
> force each member of the Honokaia Ohana to rely
> exclusively on individually constructed rain catchment
> facilities to water their cattle.  Id. ¶ 22.

> There is no way such a plan could work, in light of the
> potential for rainfall, the risks associated with rain
> catchment, and the costs of building a rain catchment
> system, at Honokaia.  Id. ¶ 23.

> Accordingly, since the first meeting held with
> prospective homestead lessees in 2005, I questioned
> DHHL planner Darryl Yagodich, who proposed to force
> Honokaia lessees to rely on rain catchment to supply
> drinking water for cattle.  Id. ¶ 24.

> At that time and since the meeting, Mr. Yagodich
> refused to acknowledge the need for potable piped water
> to supply drinking water for cattle on these homestead
> lots.  Id. ¶ 25.

> Under th[e] Aged Hawaiians Settlement, the HHC and DHHL
> created a subdivision plan to distribute pastoral
> homestead lots to eligible applicants on the Waimea
> pastoral homestead waiting list.  Id. ¶ 26.

> In offering these lots, the HHC refused to provide
> water infrastructure or water service by the County of
> Hawaii to support the pastoral homesteads, allowing for
> only rain water catchments, for which each homesteader
> was responsible to build.  Id. ¶ 28.

> When we were asked to sign a homestead lease for
> Honokaia, we together objected to the provision that
> required us to accept a condition that only rain
> catchment would be the sole means to provide water for
> cattle raising.  Id. ¶ 29.

Similarly unpersuasive is Plaintiffs' argument that the two-year limitations period should be equitably tolled on account of Defendants' wrongful conduct.  Pls.' Equal Protection Reply at 15-16.  In the context of § 1983, when the law of the forum state regarding equitable tolling is consistent with federal law, the Court should apply state law.  See Johnson v. California, 207 F.3d 650, 653 (9th Cir. 2000).  Under Hawai'i law, "to toll a statute of limitations for a complaint filed after its expiration, a plaintiff must demonstrate '(1) that he . . . has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way.'"  Office of Hawaiian Affairs, 110 Hawai'i 338, 360, 133 P.3d 767, 789 (citation omitted).  Here, Plaintiffs do not provide "any legal authorities in support of their claim that equitable tolling applies in this case" and there are no "facts in the record to indicate why [Plaintiffs] could not have brought their breach of trust claims within the two-year statute of limitations."  See id. at 360, 133 P.3d at 789.[31]

---

[31] Plaintiffs' other arguments for tolling the two-year statute of limitations relate to HRS Chapter 673, and are inapposite to the § 1983 claim.  See Pls.' Equal Protection Reply at 17-18.

Because Plaintiffs' breach of trust claim based on Defendants' alleged failure to provide infrastructure and water accrued as of November 2005 (or at the latest, February 2007, supra footnote 28), and Plaintiffs did not file this claim until July 13, 2009, the claim is barred by the governing two-year statute of limitations.  Defs.' MSJ Ex. 36 (complaint).

## III. State Claims

Having dismissed Plaintiffs' Fourteenth Amendment equal protection claim and 42 U.S.C. § 1983 claim, Plaintiffs remaining causes of action arise under Hawai'i statutory, constitutional, and/or common law.[32]

"28 U.S.C. § 1367 affords district courts the discretion to decline to exercise jurisdiction over supplemental state law claims if, among other reasons, 'the claim raises a novel or complex issue of State law,' or 'the district court has dismissed all claims over which it had original jurisdiction.'" Dream Palace v. County of Maricopa, 384 F.3d 990, 1022 (9th Cir. 2004); see 28 U.S.C. § 1367(c)(1), (3).[33]  "Needless decisions of

---

[32] The Court notes that "a violation of the HHCA arises under state law rather than federal law." Kepoo v. Watson, 87 Haw. 91, 98 n.7, 952 P.2d 379, 386 n.7 (Haw. 1998); see also Moke v. United States, Civ. No. 04-00680 ACK-LEK, order filed August 16, 2005.

[33] 28 U.S.C. § 1367(c) provides:

The district courts may decline to exercise supplemental jurisdiction over a claim [over which it
(continued...)

state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." <u>United Mine Workers v. Gibbs</u>, 383 U.S. 715, 726 (1966).  Likewise, "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine - judicial economy, convenience, fairness, and comity - will point toward declining to exercise jurisdiction over the remaining state-law claims.  <u>Carnegie-Mellon Univ. v. Cohill</u>, 484 U.S. 343, 350 n.7 (1988).

Employing its discretion under 28 U.S.C. § 1367, the Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims.  As noted, the Court is permitted to do so because it has dismissed Plaintiffs' federal claims. <u>See</u> 28 U.S.C. § 1367(c)(3).  More importantly, Plaintiffs' remaining claims raise important, difficult, and novel issues of

---

[33]/(...continued)
    has supplemental jurisdiction] if--

    (1) the claim raises a novel or complex issue of State law,

    (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

    (3) the district court has dismissed all claims over which it has original jurisdiction, or

    (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

Hawai'i law, which the Court believes should be addressed, in the

first instance, in state court.[34/]   Accordingly, the court remands

this case to state court.  <u>See Cohill</u>, 484 U.S. at 351-53

(discussing the benefits of remanding, rather than dismissing, a

removed case involving pendent claims).

## <u>CONCLUSION</u>

For the foregoing reasons, the Court: (1) GRANTS

Defendants' Motion for Judgment on the Pleadings and for Summary

Judgment with respect to Claims Seven (to the extent it is based

on the United States Constitution) and Eight; (2) DENIES

Defendants' Motion for Judgment on the Pleadings and for Summary

Judgment with respect to Claims One, Two, Three, Four, Five, Six,

and Seven (to the extent it is based on the Hawai'i

Constitution); (3) DENIES Plaintiffs' motions for partial summary

judgment; and (4) REMANDS the remaining state law claims to the

Circuit Court of the First Circuit in Hawai'i.

---

[34/] For example, the parties have not cited any cases
addressing claims that a defendant has violated: HHCA § 219.1;
Article XII, §§ 1-2 of the Hawai'i Constitution; or common law
trust or fiduciary duties imposed by the HHCA (outside the
context of § 1983).  The Court has been unable to locate any
cases adjudicating such claims.

IT IS SO ORDERED.

DATED:  Honolulu, Hawai'i, October 22, 2010.



_____
Alan C. Kay
Sr. United States District Judge

<u>Honokaia 'Ohana, et al. v. Park, et al.</u>, Civ. No. 09-00395 ACK-LEK, Order (1) Granting in Part and Denying in Part Defendants' Motion for Judgment on the Pleadings and for Summary Judgment, (2)  Denying Plaintiffs' Motions for Partial Summary Judgment, and (3) Remanding Plaintiffs' State Law Claims.